**CARIBE BMW, INC., Plaintiff, Appellant,**

**v.**

**BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, et al., Defendants, Appellees.**

No. 93–1653.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1993.

Decided March 25, 1994.

Anne M. Rodgers with whom William R. Pakalka, Fulbright & Jaworski, L.L.P., Houston, TX, Enrique J. Mendoza Mendez, Law Offices of Enrique J. Mendoza Mendez, Santurce, PR, Randall A. Hopkins, Randall A. Hopkins, P.C., Dahr Jamail, Jamail &. Kolius, Thomas R. McDade, and McDade & Fogler, L.L.P., Houston, TX, were on brief and reply brief, for plaintiff, appellant.

Irving Scher, New York City, and Manuel A. Guzman, Hato Rey, PR, with whom Bruce A. Colbath, Weil, Gotshal & Manges, New York City, and McConnell Valdes, Hato Rey, PR, were on brief, for defendants, appellees.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BREYER, Chief Judge.

This appeal raises two issues of antitrust law. First, do a firm's wholly owned subsidiary and the firm itself amount to a "single seller" under the Robinson–Patman Act? 15 U.S.C. § 13. Second, can a retailer's lost profit, brought about by a *maximum* resale price fixing agreement between that retailer and its supplier, amount to an "antitrust injury," thereby giving that retailer "standing" to obtain treble damages? *Atlantic Richfield Co. v. USA Petroleum Co.* ("*ARCO*"), 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). We answer both these questions in the affirmative. Because the district court's dismissal of the plaintiff's complaint rested upon negative answers to the same questions, we set its dismissal aside.

## I

### Background

From 1981 through 1990, Caribe BMW, Inc. ("Caribe"), through contracts with the German BMW manufacturer, Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), bought BMW automobiles from BMW AG in Germany, imported them into Puerto Rico, and sold them at retail. In February 1991, Caribe (the appellant here) brought this lawsuit against (the appellees) BMW AG and BMW's wholly owned North American subsidiary, BMW of North America, Inc. ("BMW NA"). Caribe's complaint (actually, its second amended complaint), with commendable simplicity, listed four counts.

Count I charged a violation of the Robinson–Patman Act. 15 U.S.C. § 13. It said that BMW AG sold cars to BMW NA, which resold those cars to other retailers who competed with Caribe, at prices lower than, or on terms more favorable than, those at which BMW AG sold similar cars to Caribe. Count II charged a violation of § 1 of the Sherman Act. 15 U.S.C. § 1. It said that BMW AG had set maximum resale prices for the cars that it sold to Caribe by "threaten[ing] to terminate Caribe's contracts" unless Caribe would agree, in effect, to maintain low resale prices. Count III charged "breach of contract." It listed various ways in which BMW AG had allegedly broken its word. Count IV charged that, in terminating its contract with Caribe, BMW AG had violated Puerto Rico's Dealers' Contracts Act, more familiarly known as Act 75. P.R.Laws Ann. tit. 10, § 278 et seq.

The district court dismissed the complaint for two related reasons. First, it found that the complaint's two antitrust counts "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Second, it noted that a forum selection clause in the contracts between Caribe and BMW AG provided for "exclusive jurisdiction" in "Germany" to resolve "disputes" about the "termination of" or "rights and duties arising out of" the agreement. It found this clause applicable to the remaining (non-antitrust) claims, and it dismissed those claims "for improper venue" or, in the alternative, "on grounds of *forum non conveniens.*" *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft,* 821 F.Supp. 802 (D.P.R. 1993). Caribe appeals.

When reviewing the dismissal of the antitrust claims we take the facts basically as stated in the complaint and make reasonable inferences that will help the plaintiff. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 17 (1st Cir.1992). After examining those facts, in light of the relevant law, we conclude that the district court should not have dismissed the antitrust claims. And, that conclusion requires the district court to reexamine dismissal of the other claims as well.

## II

### *The Robinson–Patman Act Claim*

■ The Robinson–Patman Act forbids "any *person*"

> to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be ... to injure ... competition with any person who ... grants ... the ... discrimination, or with [that granting person's] customers....

15 U.S.C. § 13(a). Caribe's complaint alleges most of the essentials of a violation. It says that a *"person"* has "discriminate[d] in price between different purchasers" (namely, Caribe and other retailers in competition with Caribe) of cars, with the effect that "competition with" that *person's* "customer" (namely, Caribe) is "injure[d]." *See FTC v. Morton Salt Co.,* 334 U.S. 37, 45, 68 S.Ct. 822, 827–28, 92 L.Ed. 1196 (1948). But, it embodies an ambiguity in respect to the *"person"* who did the discriminating. It says that BMW *AG* sold cars directly to Caribe, which resold them at retail. It then says that BMW *NA* sold cars to other retailers, who compete with Caribe, at lower prices than BMW *AG* sold its cars to Caribe. At this point, there appear to be two "persons" selling BMWs to retailers, namely, BMW AG (selling them to Caribe) and BMW NA (selling them to Caribe's competitors). The complaint adds, however, that BMW *NA* is the wholly owned subsidiary of BMW *AG.* Thus, we must face the legal question of whether or not this last mentioned fact is sufficient to make of the two separately incorporated companies a single "person" for Robinson–Patman Act purposes. If so, the complaint properly alleges that a single "person" has sold similar goods at two different prices (allegedly with the required statutory effect). If not, there may be no "person" who has "discriminate[d]." *See id.* ("discrimination" requires at least two sales by a single person at different prices to different customers in competition with each other); *see also* Phillip Areeda & Louis Kaplow, *Antitrust Analysis* ¶ 601(c) (4th ed. 1988); 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* § 21.11, at 192–93 (1983).

So far, when courts have faced this question—whether or not a firm and its subsidiary amount to a single "person" (or a "single seller")—they have answered it by examining the extent of common ownership *and* the degree of control over pricing and distribution policies that the one exercises over the other. *See Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.) (100% ownership, without control, not enough to create a "single seller"), *cert. denied,* 479 U.S. 848, 107 S.Ct. 171, 93 L.Ed.2d 108 (1986); *Island Tobacco Co. v. R.J. Reynolds Indus., Inc.*, 513 F.Supp. 726, 734 (D.Haw.1981) (same); *Baim & Blank, Inc., v. Philco Corp.*, 148 F.Supp. 541, 543–44 (E.D.N.Y.1957) (same); *Massachusetts Brewers Ass'n v. P. Ballantine & Sons Co.*, 129 F.Supp. 736, 739 (D.Mass.1955) (same); *see also* Kintner & Bauer, *supra,* § 21.16 at 212. In this case, the extent of ownership is 100%; Caribe's complaint alleges *nothing* about actual control. Thus, we must ask whether 100% ownership, by itself, amounts to a sufficient allegation that the "firm plus subsidiary" are a single Robinson–Patman Act "person." We conclude, for reasons that we shall now explain, that it does.

For purposes of clarity, we shall refer in our explanation to hypothetical entities whom we shall call 1) the Manufacturer (M), 2) its wholly owned Distributor (D), 3) the Retailer (R1) who buys from D, and 4) the Direct Buying Retailer (DBR), who buys directly from M and who resells in competition with R1. The distribution arrangement looks like the following:

In our case, BMW AG holds the position of M; BMW NA, the position of D; Caribe, the position of DBR; and Caribe's unspecified retail competitors, the position of R1. The legal question, put in terms of the diagram, is whether or not M's 100% ownership of D makes M and D, together, a "single seller," say "MD." If so, a single "person" (allegedly) "discriminates" in price.

We now return to the reasons for our affirmative answer, which are three. First, in 1984, after many of the above-cited "single seller" cases were decided, the Supreme Court decided *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The Court there considered the scope of Sherman Act § 1's word "conspiracy." It held that the word did not cover an agreement between a wholly owned subsidiary and its parent, because a wholly owned subsidiary could not "conspire" with the parent. That, the Court said, is because they have

a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... [And] [t]hey share a common purpose whether or not the parent keeps a tight rein over the subsidiary....

*Id.* at 771, 104 S.Ct. at 2742. The Court added that a "corporation has complete power to maintain" a portion of the enterprise either in the form of an unincorporated division, or in the form of a separately incorporated subsidiary. But, the

economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.

*Id.* at 772, 104 S.Ct. at 2742. For these reasons, the Court held,

the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.

*Id.* at 771.

Although the Court spoke of Sherman Act § 1 and of "coordinated activity," its reasoning applies here. *See* Areeda & Kaplow, *supra,* ¶ 601(c), at 929. In essence, the Court saw an identity of economic interest between parent and wholly owned subsidiary

that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one. *See generally* 7 Phillip E. Areeda, *Antitrust Law* ¶ 1464 (1986). Any claimed instance of truly "independent," owner-hostile, subsidiary decisionmaking would meet with the skeptical question, "But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?" Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of "actual" parental control would help achieve any significant antitrust objective. Those instances in which a wholly owned subsidiary would intend to act contrary to the economic interests of its owner are likely few and far between, and, if they ever exist, would seem hard to prove. *Cf.* Areeda & Kaplow, *supra*, ¶ 215.

Second, there does not seem to be any special Robinson–Patman Act purpose that a case-specific "control" inquiry would further. To the contrary, one would not want a seller to be able to defeat the statute's clear objectives by transforming unlawful, into lawful, price discrimination through the creation of a separately incorporated subsidiary "distributor" that sells to the disfavored customers, whether or not the parent retained "control" over the pricing decisions of the subsidiary. Suppose, for example, that M violates the Act by selling to one retailer (DBR) at $10 and another competing retailer (R1) at $12. M should not be able to avoid the law simply by creating a wholly owned, but "independent" D, to whom it sells at $10, knowing that "independent" D will (say, for profit-maximizing reasons) "independently" resell to R1 at the same $12 price.

We are aware that this area of the law is filled with difficulty. For example, should Robinson–Patman Act liability attach in the example just given if (contrary to our assumption) the wholly owned distributor, D, really fulfills an important distribution function, necessary to supply R1, but not needed in the case of sales to DBR, such that DBR "ought" to receive a lower price? Or, suppose M (perhaps as here) sets a higher price to direct buyers in order to discourage direct sales and thereby to encourage the creation

of an independent distribution network? These problems arise, however, in part, because it is difficult to reconcile the Robinson–Patman Act's strictures with traditional practices of corporations that seem to make sense from a practical viewpoint. *See, e.g., Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 559–62, 110 S.Ct. 2535, 2544–46, 110 L.Ed.2d 492 (1990); Kintner & Bauer, *supra*, § 22.14; James F. Rill, *Availability and Functional Discounts Justifying Discriminatory Pricing,* 53 Antitrust L.J. 929 (1985). And the complexity of Robinson–Patman Act law has increased as courts have tried to introduce a degree of flexibility into the Act as applied. *See, e.g.,* Kintner & Bauer, *supra*, § 25.7, at 454–460 (discussing the availability defense); *Hasbrouck,* 496 U.S. at 561, 110 S.Ct. at 2545 (discussing functional discounts); 15 U.S.C. § 13(a) (cost justification defense); *see also* Rill, *supra.*

For present purposes, however, we need only note that these same problems exist, in one form or another, *regardless* of our holding in this case. That is to say, a contrary holding would nonetheless produce the same problems wherever M does "control" the pricing policies of its wholly-owned subsidiary D (i.e., in most cases). And, in the remaining cases (where wholly-owned D is somehow nonetheless "independent"), various other, related, Robinson–Patman Act problems would often arise if DBR complained about differences in price between M's price to D and M's price to DBR. *See* pp. 750–51, *infra.* Thus, we find nothing special in the Robinson–Patman Act context that militates against *Copperweld*'s reasoning or result.

Third, applying *Copperweld* avoids a potential anomaly. A majority of courts, using a *Copperweld*-type analysis, have held that a firm M's sale of a good to a wholly owned subsidiary D is not a "sale" for Robinson–Patman Act purposes; rather, it is simply a transfer; and that is so whether D is, or D is not, somehow "independent" in reality. *See City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 278 (8th Cir.1988); *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.,* 772 F.2d 214, 221 (6th Cir.1985) (per curiam) (quoting *Copper-*

*weld,* 467 U.S. at 772 n. 18, 104 S.Ct. at 2742 n. 18); *O'Byrne v. Checker Oil Co.,* 727 F.2d 159, 164 (7th Cir.1984); *Security Tire & Rubber Co. v. Gates Rubber Co.,* 598 F.2d 962, 965–67 (5th Cir.), *cert. denied,* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979). These holdings mean that D, the transferee, is not a "purchaser" from M, and, for that reason, M does not violate the Act even if he sells the same good to a direct buying retailer (DBR), or even a direct competitor of D, at a higher price than the price at which he "transfers" the good to D. Our holding today means that when the wholly-owned subsidiary D resells the good to R1, it must do so at a "nondiscriminatory" price, i.e., at a price that would be permissible under the Act had D's sale to R1 been made by M. Thus, if M sells to DBR at 14, D cannot sell to R1 for less than 14 (assuming, of course, that all other Robinson–Patman Act liability conditions are met and no defenses are available).

But, suppose we were to hold the contrary. Suppose that we were to hold that a wholly-owned subsidiary D and its owner M were *not* a "single seller" where D was somehow nonetheless "independent." Then, an anomalous difficulty might well prevent DBR from bringing an action where M "transfers" to D at 10, D resells to R1 at 12, but M insists on charging DBR 14 (i.e., approximately the allegations before us). The doctrine just mentioned—in effect finding that M and D are a single entity for purposes of the transfer between them—would prevent DBR from complaining about the effect of the M–D "transfer." *Cf. Hasbrouck,* 496 U.S. at 569–71, 110 S.Ct. at 2549–51. At the same time, our (imagined) holding (the opposite of our actual holding) that M and D were *not* a single entity for purposes of D's sale to R1 would likely prevent DBR from complaining about the effect of that sale because of its inability to find a single "person" who discriminated (because M does not sell to R1, while D does not sell to DBR, *see* p. 750, *supra* ).

■ Perhaps one could somehow avoid this anomaly in other ways, but it seems undesirable to invent epicycles in an already too complex area of the law. It is simpler to hold in parallel fashion that ownership alone makes a "single seller" of a firm and its wholly owned distributor, just as ownership alone eliminates the possibility of a Robinson–Patman Act "sale" between them.

We therefore find it appropriate to apply *Copperweld*'s reasoning outside Sherman Act § 1. *See, e.g., City of Mt. Pleasant,* 838 F.2d at 278; *Russ' Kwik Car Wash,* 772 F.2d at 221; *cf. United States v. Waste Management, Inc.,* 743 F.2d 976, 979 (2d Cir.1984) (attributing subsidiary's activity to parent for purposes of Clayton Act § 7). We hold that BMW AG's ownership of BMW NA makes of those two entities, for Robinson–Patman Act purposes, a single seller.

■ We now turn to a second, independent reason the district court gave for concluding that the complaint did not adequately state a Robinson–Patman Act claim. The court correctly noted that if a seller makes its favorable prices and terms available to an otherwise disfavored customer, that customer has no legal right to complain. *See, e.g., Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1326, 1328–29 (6th Cir.1983) (discussing availability defenses to §§ 2(a), 2(d), and 2(e)); *Shreve Equip., Inc. v. Clay Equip. Corp.,* 650 F.2d 101, 105–06 (6th Cir.) (discussing availability under § 2(a)), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Edward J. Sweeny & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 120–21 (3d Cir.1980) (same), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *see also* Kintner & Bauer, *supra,* § 25.7. The district court then concluded that Caribe, in a portion of its complaint, in effect *conceded* that BMW made its favorable prices and terms *available* to Caribe. That complaint portion says that in 1987

despite Caribe's remarkable success, BMW attempted to convert Caribe from being an importer-retailer purchasing directly from the factory to being a mere retail dealer purchasing from BMW N.A.

We do not believe, however, that one can draw from this statement the "availability" concession that the district court found. The complaint also says that

*[u]nbeknownst to Caribe,* and beginning by at least 1987, BMW began lowering its prices for BMWs sold to Caribe's competitors and offering those competitors other economic advantages while maintaining its prices to Caribe at a discriminatorily high level and not making the other economic advantages available to Caribe on proportionately equal terms.

The emphasized language says that Caribe did not know that its competitors were receiving favored treatment. And, we do not see how ordinarily one could say that a seller has made favored treatment "available" to a disfavored customer if the disfavored customer *does not know* about the favored treatment. *See, e.g., Alterman Foods, Inc. v. F.T.C.,* 497 F.2d 993, 1001 (5th Cir.1974); *Mueller Co. v. F.T.C.,* 323 F.2d 44, 46–47 (7th Cir.1963), *cert. denied,* 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964); *Century Hardware Corp. v. Acme United Corp.,* 467 F.Supp. 350, 355–56 (E.D.Wis.1979).

■ Caribe also argues that the favored treatment, as a practical matter, was not "available" because BMW AG insisted that it give up various advantages of its importer's contract in order to obtain it. We cannot tell from the complaint, however, just what those advantages were and how they related to the practical "availability" of the favorable treatment given other retailers. Thus, we cannot say, at this time, whether or not Caribe will be able to prove that the favorable price and terms, as a practical matter, were not available. At this stage, however, Caribe has sufficiently alleged that they were not.

■ Our conclusion is that Caribe's complaint states a valid Robinson–Patman Act claim, in respect to price discrimination under Robinson–Patman Act § 2(a), and for similar reasons, under the Robinson–Patman Act sections that deal with payments for services, furnishing services, and brokerage payments. 15 U.S.C. § 13(b), (d)–(e). Although Caribe's pleadings regarding these other Robinson–Patman Act sections are rather sparse, they are sufficient to give BMW AG and BMW NA notice of the substance of Caribe's complaint. Caribe also claimed that BMW NA violated § 2(f), which forbids knowingly inducing or receiving a

discrimination in price. 15 U.S.C. § 13(f). In light of our holding that BMW NA is not a separate "person," however, that portion of the complaint must be dismissed.

### III

### *The Sherman Act*

■ Count Two of the Complaint says that

> BMW has for years imposed as a secret condition of Caribe's contracts an agreement or understanding that Caribe charge its customers prices set by BMW.... More specifically, BMW threatened to terminate Caribe's contracts unless Caribe agreed not to raise its margins (i.e., and thus its retail prices) above levels fixed and set by BMW, and Caribe reluctantly agreed.

This complaint sets forth a claim that BMW and Caribe agreed to fix "maximum" resale prices. The Supreme Court has held that Sherman Act § 1 forbids this kind of agreement. *See Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The complaint also alleges that the "agreement caused Caribe to lose additional profits." And, Clayton Act § 4 permits any "person" whose "business" is "injured" by "reason of anything forbidden in the antitrust laws" to recover treble damages. 15 U.S.C. § 15.

The district court nonetheless dismissed the complaint in light of Clayton Act § 4's requirement that the injury must result from an action that the antitrust laws forbid. The courts have held that this requirement means the injury itself must be a special "antitrust injury," which is to say that it must amount to "the *type*" of harm "the antitrust laws were intended to prevent," and it must flow "from *that which* makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis added). The district court thought that Caribe's lost profits were not the "type" of harm that the anti-maximum-resale-price-fixing rule seeks to prevent. And, it rested that conclusion upon its reading of a Supreme Court case, *Atlantic Richfield Co. v.*

USA Petroleum Co. ("ARCO"), 495. U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

As the district court pointed out, in *ARCO* the Supreme Court considered the anticompetitive possibilities that had earlier led the Court to find maximum resale price agreements unlawful. The Supreme Court referred to three. First, the "maximum" resale price agreement might be, in reality, a disguised "minimum" resale price agreement, in which case the agreement would threaten the very kinds of harm that led the Court, in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), to find minimum resale price agreements unlawful *per se*. *ARCO*, 495 U.S. at 336, 110 S.Ct. at 1890. Second, a maximum resale price agreement might prevent a dealer from providing "services and conveniences" that customers would want to the point that the customers would accept (if necessary) the price increases needed to provide them. *Id.* at 335–36, 110 S.Ct. at 1889–90. If so, a supplier's judgment about the proper resale price (imposed through the supplier's maximum resale price agreement) would prevent consumers from obtaining what they want (higher quality product) from retailers who would like to supply it. *Id.* Third, a "maximum resale price agreement" might " 'channel distribution through a few large or specifically advantaged dealers,' " the only ones able to earn a profit at the mandated, low resale price. *Id.* at 336, 110 S.Ct. at 1890 (quoting *Albrecht*, 390 U.S. at 153, 88 S.Ct. at 873).

The Supreme Court went on to hold that the *ARCO* plaintiffs had not suffered "antitrust injury." But it noted, and we note, that, unlike Caribe, the *ARCO* plaintiffs were not dealers who themselves had entered into (or been forced to enter into) such agreements; rather they were the *competitors* of those dealers. They had claimed that the agreements had helped the ARCO dealers (who entered into the agreements) obtain more sales, thereby leaving them, the competitors of the ARCO dealers, with fewer sales for themselves. The Supreme Court held that, whatever else might be wrong with the plaintiffs' assertion, it did not allege harm of the *type* that *Albrecht* sought to prevent. *That* kind of harm would have taken the form of *fewer* ARCO dealers, or *fewer* sales for the dealers who had entered into the agreements (because those customers wanting higher prices and extra services could not get them), not *more* ARCO dealer sales. The Supreme Court then wrote that the plaintiffs, being *rival* dealers, were

> *benefited* rather than harmed if [ARCO's] pricing policies restricted ARCO sales to a few large dealers or prevented [ARCO's] dealers from offering services desired by consumers such as credit card sales.

*Id.* 495 U.S. at 336–37, 110 S.Ct. at 1890. The Court added that if an agreement

> lowers prices but maintains them above predatory levels, the business lost *by rivals* cannot be viewed as an "anticompetitive" consequence of the claimed violation.

*Id.* at 337, 110 S.Ct. at 1891 (emphasis added).

In this case, Caribe is not in the same position as the *ARCO* plaintiffs, for Caribe is the very firm that the alleged maximum resale price fixing agreement forced to keep its price below the level it preferred to set. At least in theory, if customers would have preferred a higher price and consequently better product quality or greater service, the agreement forced Caribe to provide less of what they wanted; the agreement thereby might have led to lower Caribe profits. And, at least in theory, if the agreement helped other, larger *BMW* dealers, Caribe is the firm that would have suffered. Thus, Caribe's complaint here alleges antitrust harm of the "type" that Clayton Act § 4 authorizes it to assert. *ARCO* supports, it does not deny, Caribe's standing.

We recognize that *Albrecht* has proved a controversial case. That is, in part, because it seems to outlaw not only anticompetitive uses of maximum price fixing, but also procompetitive uses as well, namely, use of a *maximum* resale price agreement that protects consumers from the exercise of a retailer's monopoly power. *See, e.g.*, 8 Phillip E. Areeda *Antitrust Law* ¶ 1636 (1989). And insofar as Caribe's claim of "lost profits" refers to "losses" that occurred because the agreement prevented Caribe from raising prices above the competitive level, it is at

least arguable that no "antitrust injury" occurred. *See id.* ¶ 1640; Phillip E. Areeda, *Antitrust Law* ¶ 340.3b, at 509–510 (Supp. 1993). But, at this stage of the proceeding, we must view Caribe's complaint in a favorable, not an unfavorable, light. We therefore read the complaint as implying that the agreement cost Caribe profits because it inhibited Caribe from selling to those potential BMW customers who would have preferred higher quality service, even if that meant somewhat higher Caribe prices.

We recognize that one might also wonder, as did the district court, how Caribe could have been injured *both* by a Robinson–Patman Act violation and by a maximum resale price agreement. How could it have suffered lost customers attracted by the *lower* prices of retailers who bought cheaply from BMW NA and also have suffered lost profits because it could not *increase* its prices? One might answer this question, however, by inferring from the complaint that Caribe has two different kinds of customers. Some want to pay the lowest possible prices; others would pay more to receive special services that Caribe would offer only if it could charge higher prices. At least in principle, possibilities of this sort are not outlandish. And, it seems to us that Caribe is entitled to have a court draw these inferences at this complaint stage of the proceeding. *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1081 (1st Cir.1993).

We conclude that the district court should not have dismissed count II of the complaint.

## IV

### *Puerto Rico Antitrust Claims*

■ Caribe asserted claims under Puerto Rico's antitrust law that parallel its federal antitrust claims. As the parties seem to agree, courts interpret Puerto Rico's laws as essentially embodying the jurisprudence relevant to the parallel federal law. For that reason we reinstate the Commonwealth anti-

trust claims to the same extent that we have reinstated the federal claims. *Cf. R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 486–88 (1st Cir.1994); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 723 F.2d 155, 161 (1st Cir.1983), *aff'd in part and rev'd in part, on other grounds*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

## V

### *The Contract Claims and the Act 75 Claim*

■ Our antitrust count decisions require the district court to reconsider its remaining dismissals, of Caribe's breach of contact claims and its Act 75 claim. The district court dismissed those counts because of a forum selection clause in the Caribe contracts, which says

the exclusive jurisdiction for disputes concerning the ... termination of this agreement as well as all and any rights and duties arising out of this agreement is ... Germany.

The court did not decide, however, whether or not this clause covers antitrust counts (for it had dismissed those counts for failure to state a valid claim). We cannot tell from the wording of the clause alone whether it does, or does not, cover antitrust claims—whether such claims "concern" the "termination" of, or "rights and duties arising out of," the "agreement." And, it seems to us that the parties should have an opportunity to pursue that question further in the district court. *Compare Mitsubishi Motors*, 723 F.2d at 159–61 (analyzing numerous provisions in contract to determine intended scope of a forum selection clause) *with Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718, 720 (2d Cir.1982) (broadly worded forum selection clause includes antitrust claims).

The answer to this question, depending upon what it is, might add strength to (or weaken) plaintiff's argument that the forum selection clause cannot apply to the Act 75 claim. It also could affect the arguments about the comparative "convenience" of Puerto Rico for a trial on the contract and Act 75 claims. Were it to turn out, for example, that an antitrust trial had to take place anyway in Puerto Rico, the compara-

tive balance of conveniences might well change.

We do not mean to express any view, however, on the merits of these or other arguments (such as jurisdictional arguments) that the parties may make as the case proceeds further. We simply hold that the district court should not have dismissed the antitrust claims in the complaint. And, that holding, in turn, requires the court to reconsider its other dismissals.

The judgment of the district court is vacated and the case is remanded for further proceedings.

*So ordered.*