**HEWLETT–PACKARD COMPANY,**
Plaintiff,

v.

**BOSTON SCIENTIFIC CORPORATION,**
Defendant.

**No. Civ.A. 99–10244–PBS.**

United States District Court,
D. Massachusetts.

Nov. 30, 1999.

---

Robert M. Buchanan, Jr., Kevin P. Light, Joshua Engel, Choate, Hall & Stewart, Exchange Place, Boston, MA, for Hewlett–Packard Co., plaintiff.

Robert F. Ruyak, Howrey & Simon, Washington, DC, P. Todd Mullins, Howrey & Simon, Washington, DC, Steven M. Bauer, Kurt W. Lockwood, Testa, Hurwitz & Thibeault, Boston, MA, for Boston Scientific Corp., defendant.

1. The complaint (corrected) alleges that BSC has unlawfully monopolized, or attempted to monopolize, the market for IVUS catheters and consoles in the United States in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (Count I); violated Mass.Gen.L. ch. 93A (Count II); breached the licensing agreement (Count III); breached the implied

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Hewlett–Packard Company ("HP") brings this action [1] against defendant Boston Scientific Corporation ("BSC") alleging that BSC unlawfully monopolized, or attempted to monopolize, the intravascular ultrasound ("IVUS") catheter and console markets in the United States, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and state law. An IVUS catheter is a flexible tube-like device used in conjunction with a console to obtain sonographic images of arteries. HP also seeks a declaratory judgment that it is no longer obligated to make payments under a licensing agreement which the two companies entered into pursuant to a consent decree required by the Federal Trade Commission ("FTC") as a condition to allowing BSC's merger with two other medical technology companies.

BSC has filed a motion to dismiss all counts pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds, *inter alia,* that the antitrust claim is facially deficient because HP failed to allege: (1) that BSC has current monopoly power in the catheter or console markets in the United States; or (2) that BSC committed predatory acts that could reasonably be interpreted as causing antitrust injury to competition. After hearing and a review of the excellent briefing by both sides, the motion is ***DENIED.***

### II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in the non-movant's favor, HP's complaint alleges the following facts:

covenant of good faith and fair dealing (Count IV); and has been unjustly enriched (Count V). The complaint seeks a declaratory judgment that HP is no longer required to make payments under the licensing agreement (Count VI), as well as treble damages and attorneys fees.

## A. The Products: Catheters and Consoles

IVUS catheters are medical devices that are used to diagnose and treat cardiovascular ailments. They are flexible tube-shaped objects that are inserted into a blood vessel. A transducer, located at the forward end of the catheter, generates and transmits ultrasound waves. These waves reflect off the arterial walls, and a receiver measures the amount of returned energy. The catheter compares the transmitted and received energy and sends a signal to a console that displays a 360 degree image of the blood vessel. The image allows physicians to assess the amount of plaque deposits in blood vessels.

There are two types of IVUS catheters. Phased array catheters use several stationary transducers to create a 360 degree image of the blood vessel. Mechanical catheters also create a 360 degree image, but do so with a single transducer that is spun by an external motor drive unit. This case centers around mechanical catheters.

## B. Market Conditions Prior to 1995

BSC, headquartered in Natick, Massachusetts, develops and manufactures medical products. HP's headquarters is in Palo Alto, California, and its Medical Products Group is located in Andover, Massachusetts. Both companies have long been participants in IVUS markets—BSC sold catheters and HP sold consoles. Until 1995, they had a cooperative history and on occasion have engaged in joint ventures to design BSC catheters specifically to operate on HP consoles. As of mid–1994, BSC and Cardiovascular Imaging Systems, Inc. ("CVIS") were the market leaders with respect to the development, manufacture, and sale of IVUS catheters. BSC held 40% of that market, and CVIS held 50%. The market for IVUS consoles was equally concentrated—CVIS controlled 40% and HP controlled 50%.

In August 1994, BSC dramatically shifted the balance of power by seeking to acquire CVIS. Three months later, BSC took steps to acquire SCIMED Life Systems, Inc. ("SCIMED"), which was preparing to enter the IVUS catheter market within the next two to three years.

Believing that BSC's acquisitions would lessen competition and create monopoly power in the IVUS catheter market, in January 1995 the Federal Trade Commission filed suit against BSC for violation of the Clayton Act, 15 U.S.C. § 45, and the Federal Trade Commission Act, 15 U.S.C. §§ 18 & 21. The FTC sought an injunction to prevent the CVIS acquisition.

## C. The Licensing Agreement

As part of settlement negotiations with the FTC, BSC sought a suitable competitor in the IVUS catheter market. On February 21, 1995, the company entered into a licensing agreement granting HP the right to use BSC's IVUS technology ("Licensed Technology") in conjunction with the manufacture and sale of certain products ("Licensed Products").

The licensing agreement defined Licensed Technology as all BSC, SCIMED, and CVIS patents used for the "development, manufacture and sale of Licensed Products ... and all existing know-how" relating to the manufacture, sale, and distribution of those products. Licensed Products included "ultrasound imaging catheters, imaging cores and imaging guide wires which are designed for diagnostic or therapeutic use, or both, in the human heart and/or in the human coronary and peripheral vascular system."

The Licensed Products definition also referenced Exhibit A, stating that it "includes and is no narrower than the collective claims of the patents ... listed on Exhibit A." Among several patents listed on Exhibit A was BSC's "pullback patent."[2] This technology allows physicians

2. U.S. Patent No. 5,361,768. Patents for re-

lated technologies, U.S. Patent Nos. 5,485,-

to retrieve an inserted catheter at a fixed rate of speed, enabling the physician to measure plaque accumulations more accurately.

The licensing agreement also included an "open interface" provision that required both parties to ensure that their consoles were able to be used with the other party's existing catheters. Each party assumed a responsibility to "cooperate . . . in furthering this open interface objective," but retained the option of upgrading its consoles. To facilitate this provision, prior to introducing a new IVUS product, the parties agreed to share technical information relating to new products.

The licensing agreement also contained an "interim supply commitment," which was designed to allow HP to compete in the catheter market while developing its own line of catheters. BSC agreed to supply HP with all BSC catheters at a below market price (average manufacturing cost plus 40%) for resale by HP. The agreement also required BSC, immediately after acquiring CVIS, to introduce its new "Spy" catheter, which was specifically developed for use with HP consoles.

In exchange for the right to use BSC's technology, HP agreed to pay a substantial fee. The parties agreed that one-third of the total fee was to be paid within 30 days of the agreement's effective date. The remaining fee was to be paid in three equal installments payable in May 1998, 2000, and 2002. To date, HP has made the initial payment and the May 1998 installment.

## D. *The FTC Consent Order*

The FTC agreed to withdraw its suit and allow the CVIS acquisition only after BSC entered into the licensing agreement with HP. On February 23, 1995, the FTC and BSC entered into a Consent Order, requiring BSC to license its IVUS technology portfolio to HP "pursuant to, and in accordance with, the February 21, 1995

agreement" between BSC and HP "which agreement is appended to this Order in Confidential Appendix II." (Pl.Exh. B at 12.) The order's stated purpose was to create an "independent competitor in the development, production and sale of IVUS catheters and to remedy the lessening of competition resulting from the CVIS acquisition and the SCIMED acquisition as alleged in the Commission's Complaint." (*Id.* at 5.) IVUS catheters were defined as "intravascular ultrasound catheters, intracardiac ultrasound catheters, removable imaging cores used in intravascular or intracardiac ultrasound imaging, and intravascular imaging guidewires." (*Id.* at 3).

The FTC's order contained four primary provisions. First, it required BSC to license its "IVUS Technology Portfolio" to HP or another suitable company. It defined IVUS technology portfolio to include: a) all rights to BSC, CVIS, and SCIMED United States and foreign IVUS catheter patents; b) all CVIS and SCIMED trade secrets, technology and know-how relating to IVUS catheters; and c) all IVUS catheter customer lists. Second, it required BSC to provide technical assistance to the licensee in manufacturing the catheters and obtaining regulatory approval. Third, BSC was required to provide HP with a supply of catheters for resale. Finally, the order prohibited BSC from entering into any arrangement that would make BSC's catheters compatible with only certain consoles.

In exchange for these commitments, the FTC withdrew its suit and request for an injunction. BSC acquired CVIS and SCIMED.

## E. *Alleged Unlawful Acts*

HP claims that BSC "consciously and willfully thwarted the purposes of the Consent Order and the License Agreement," and by doing so secured a "monopoly over IVUS catheters and acquired or attempted to acquire a monopoly over IVUS con-

846; 5,592,942; and 5,759,153, have since

been issued.

soles." HP alleges the following predatory conduct:

### 1. *Refusal to Provide Complete and Accurate Interface Specifications*

Prior to acquiring CVIS, BSC produced a line of catheters named "Sonicath." These catheters were designed to operate on HP consoles. At the same time, CVIS produced a line of catheters named "Microline" that were designed to operate on CVIS consoles. After the merger, BSC replaced these catheters with a new line called "Ultracross" that combined the features of the Microline and Sonicath catheters.

Customers advised HP that the Ultracross catheters did not spin properly when used with HP consoles. Similar problems were reported with BSC's Microview, Microrail, and Discovery catheters. HP claims this is a violation of the licensing agreement which required BSC to disclose "all necessary technical specifications, regulatory information and the like" for HP to ensure its consoles were compatible with BSC catheters. (Pl.Exh. C. at 8.) HP further alleges that BSC sales representatives exploited these problems to discourage customers from purchasing consoles or catheters from HP.

### 2. *BSC Threatened to Sue HP and HP's Customers for Patent Infringement*

HP marketed a catheter with an automatic pullback device that was based on the pullback patent listed in Exhibit A of the licensing agreement, which was referenced in the Licensed Products definition. The HP catheter directly competed with a BSC catheter that had a pullback device. BSC claimed that HP was not authorized to use the pullback patent and threatened to sue HP for patent infringement. BSC also told customers that HP's pullback device infringed on a BSC patent and threatened to sue customers who continued to use the HP automatic pullback device. HP alleges that the BSC's threats caused some potential customers to decide not to purchase HP catheters or consoles. HP claims BSC's actions violated its agreement not to assert any of its patent rights in "a way that would prevent HP from practicing any of the Licensed Technology to manufacture, use, or sell Licensed Products." (Pl.Exh. C at 2–3.)

### 3. *BSC Refused to Create a Console Interface for the HP Scout Catheter*

HP designed and developed a new catheter called "Scout" and provided its technical specifications to BSC so that BSC could ensure that the catheter would operate with BSC consoles. BSC did not create the requested interface. HP alleges that by not making a meaningful effort to do so, BSC sought to make the catheter commercially unsuccessful in furtherance of BSC's objective to monopolize the catheter and console markets. HP claims this refusal violated BSC's obligation to "provide on all its IVUS consoles ... open interfaces to the IVUS products of the other party." (Pl.Exh. C at 7.)

### 4. *BSC Discontinued the Sonicath Catheter, Refused to Provide HP with BSC's Discovery Catheter, and Failed to Sell its Spy Catheters*

In 1992, BSC and HP entered into a joint development agreement to design and market BSC's Sonicath catheters which were intended to be used exclusively with HP consoles. After the CVIS acquisition, BSC developed a new line of catheters called "Discovery" and decided to discontinue the Sonicath line. BSC did not supply HP with the Discovery catheter for resale, and decided not to introduce the Spy catheter line. HP claims this violates BSC's obligation to "make available to HP all BSC IVUS Catheters," (Pl.Exh. C. at 8), and "to begin sales of the 'Spy' catheter immediately upon consummation of the CVIS acquisition," (*Id.* at 11).

HP alleges that these decisions dramatically reduced the number of catheters that were compatible with HP consoles and discouraged customers from purchasing HP consoles.

### 5. *BSC Failed to Provide HP With the Required Notice of Its Redesign of an IVUS Catheter Hub*

A hub is the fitting that connects the catheter to the console. It allows the console to spin the catheter at a fixed rate of speed. After acquiring CVIS, BSC redesigned the Sonicath hub to fit its (formerly CVIS's) consoles. BSC did not provide the technical specifications of the redesigned hub to HP prior to introducing it into the market. HP claims that BSC willfully breached the licensing agreement which required a party introducing a new product to provide the product's technical specifications to the other party "no later than 180 days prior to ... commercial introduction" of that product. (Pl.Exh. C at 8.)

### III. DISCUSSION

In determining whether to dismiss a complaint for failure to state a claim upon which relief may be granted under Fed. R.Civ.P. 12(b)(6), the Court must accept as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992) (citing *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990)); *see also Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The complaint may not be dismissed unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

■ This standard applies to an antitrust claim. *See Caribe BMW, Inc. v.*

*Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 748 (1st Cir.1994). In antitrust cases "where the proof is largely in the hands of the [defendant], dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly." *Hospital Bldg. Co.*, 425 U.S. at 746, 96 S.Ct. 1848. However, sparingly does not mean never. A plaintiff must allege sufficient facts in order to state each element of the antitrust violation. *See C.R. Bard, Inc. v. Medical Electronics Corp.*, 529 F.Supp. 1382, 1389 (D.Mass. 1982).

### A. *Monopoly Power*

■ BSC argues that the complaint fails to allege its current market power or define the market conditions during the relevant time period. The antitrust law makes it unlawful for a firm to "monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States." Sherman Act § 2, 15 U.S.C. § 2. To state a claim of monopolization, a plaintiff must allege: 1) that the defendant possesses monopoly power in the relevant market; and 2) that the defendant willfully acquired, maintained or used that power by exclusionary means. *See United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir.1990). The two elements will be discussed separately.

### 1. *Monopoly Power*

■ Monopoly power is often defined as "the power to raise prices and exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (same). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698. For pleading pur-

poses, an allegation of market share of 70 percent has been held to be an adequate basis for an inference of power in a relevant market. *International Audiotext Network, Inc. v. American Telephone and Telegraph Co.*, 893 F.Supp. 1207, 1217 (S.D.N.Y.1994) (suggesting that a conclusory allegation of predominant market share, without more, would support dismissal, but dismissing on other grounds), *aff'd*, 62 F.3d 69 (2d Cir.1995).

With respect to the IVUS catheter market, HP asserts that, once BSC acquired CVIS, BSC controlled 90% of the IVUS catheter market. (Compl. at ¶¶ 2, 38.) Now that HP has left that market supposedly because of BSC's anti-competitive behavior, HP alleges that BSC currently accounts for "substantially all" of the IVUS catheters sold in the market. (*Id.* ¶ 107).

Defendant argues that the market share prior to the licensing agreement is irrelevant because it is outdated, and that these allegations concerning today's market shares are insufficient. It asserts that the four year old market no longer exists, that the agreement substantially changed the competitive landscape, and that a third party (EndoSonics Corporation) has developed into a stronger competitor. Because BSC's allegations that its market share is declining and EndoSonics' share is growing are beyond the four corners of the complaint, they cannot be considered in resolving this motion—although they will certainly be relevant at another stage of the litigation. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1184 (1st Cir.1994) ("Antitrust law generally seeks to punish and prevent harm to consumers in particular markets, with a focus on relatively specific time periods."); *United States v. Sargent*, 785 F.2d 1123, 1127 (3d Cir.1986) (discussing changes in market share between an indictment and trial); and *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982) (stating that a decline in an antitrust defendant's market share during the relevant period "belies

whatever inference of capacity to monopolize that may be drawn from the size of its market share").

█ In light of the allegations concerning the pre-agreement market share, the high barriers to entry in the marketplace posed by the patents, the regulatory clearance requirements, the need for technological expertise, and HP's precipitous withdrawal, these allegations that BSC controls "substantially all" the catheter market are more than ample to meet pleading requirements with respect to monopoly power in the IVUS catheter market in the United States. *See International Audiotext*, 893 F.Supp. at 1217; *C.R. Swaney Co., Inc. v. Atlas Copco North America, Inc.*, CIV.A. No. 85–587–N, 1987 WL 33025, *13 (D.Mass.1987) ("While it may have been preferable to make more specific allegations as to market share, at this early stage of the litigation an allegation of 'market dominance' is sufficient to survive a motion to dismiss." (citation omitted)); *but cf. Walker Distributing Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 9 (9th Cir.1963) (finding the allegation that defendant "was one of the largest manufacturers of beer in the west" was deficient because nothing was said about its position in the market in question).

A somewhat closer issue involves the console market. The complaint states that as of 1995, HP controlled 50% of the console market, making it the market share leader, and CVIS controlled 40%. There were no other significant competitors. (Compl.¶¶ 33–34.) Once BSC merged with CVIS, it gained control of over 40% of this market. (*Id.*) The complaint alleges that HP was prevented from competing in that console market, and that BSC now accounts for "substantially all of the IVUS consoles sold in the United States." (*Id.* ¶ 107). Because HP was the market leader in the manufacture of IVUS consoles, it is less clear whether its withdrawal from the market now catapults BSC into the current position of having monopoly power

in that market. For example, nothing is alleged with respect to BSC's current activities in manufacturing IVUS consoles. However, the Court need not determine whether the complaint edges over the low pleading barrier with respect to the monopolization claim because plaintiff also asserts a claim of attempted monopolization, which easily salvages this claim.

### 2. *Willful Acquisition and Maintenance of Monopoly Power*

■ The second element of a Section 2 claim is the acquisition or maintenance of monopoly power by other than such legitimate means as patents, "superior product, business acumen, or historic accident." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir.1983) (citing *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. 1698). The complaint must allege that the monopolist acquired or maintained that monopoly through exclusionary conduct. *See id.* " 'Exclusionary conduct is conduct, other than competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining a monopoly.' " *Id.* (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626, at 83 (1978)). Conduct is exclusionary if it exceeds the needs of ordinary business dealings and unnecessarily excludes competition from the relevant market. *Id.* The First Circuit succinctly framed the question: "Was [defendant's] conduct reasonable in light of its business needs or did it unreasonably restrict competition?" *Id.*

HP claims that BSC willfully acquired a monopoly by acquiring CVIS and SCIMED, and violating in bad faith the FTC's consent decree imposed as a condition of the merger. HP contends that BSC duped the FTC into allowing the acquisitions by licensing its technology to HP, and then, by systematically breaching the licensing agreement, BSC completely undercut any possible remedial effect of the consent decree. The complaint sets forth a litany of alleged breaches that HP contends were done with the calculated desire to exclude HP from the IVUS console and catheter markets. The alleged breaches are that BSC: unreasonably and in bad faith refused to provide accurate interface specifications for its catheters; threatened to sue customers who used HP's pullback device; refused to create an interface for an HP catheter; reduced the number of catheters that are compatible with HP consoles; and failed to provide notice of the re-design of a catheter hub.

■ Defendant argues that by entering into the licensing agreement it released its monopoly position. However, the licensing agreement is a shield only if defendant acts in good faith to comply with its terms. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir.1985) ("[I]t is well established that an agreement which purports to license trade secrets, but in reality, is no more than a sham, or device designed to restrict competition, may violate antitrust laws.").

BSC argues that HP has presented a laundry list of minor contract skirmishes under provisions of the licensing agreement which are not specifically mandated by the consent order, and do not rise to the level of predatory conduct. It relies on *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 374–76 (7th Cir.1986), which provides false consolation, although it provides a useful comparison. In *Olympia*, a federal regulatory agency (the Federal Communications Commission) had required defendant to allow competition, and defendant voluntarily undertook acts to "foster competition by subsidizing its competitors' selling costs." *Id.* at 375. The Seventh Circuit rejected an antitrust claim generated when defendant stopped these affirmative steps not required by any antitrust obligation, stating: "A firm that voluntarily encourages new competition in a tributary market should not be penalized by being made to pay damages under the antitrust laws." *Id.*

In contrast to *Olympia*, the steps to promote competition here were not voluntary. They were contractual obligations which were incorporated into a FTC Consent Order as a remedy for the lessening of competition caused by the acquisitions. At this pleading stage, the allegation of a bad faith violation of the licensing agreement, specifically designed to promote a viable, independent competitor in the catheter market, permits an inference of exclusionary conduct.

BSC makes the fair point that the FTC's order was not designed to promote competition in the *console* market. It hints that HP's design of the Scout catheter was unreasonable because it had a new console interface that would not run on either party's installed base of consoles, and therefore, the breach of the agreement was not unreasonably restrictive. Again, BSC's argument that its refusal to provide an open interface was based on legitimate business reasoning might be a fair defense on an expanded record. The allegations of an unreasonable refusal to cooperate on the console interface are sufficient to support an inference of exclusionary conduct in the console market. *See Aspen Skiing*, 472 U.S. at 603, 105 S.Ct. 2847 (affirming the jury finding that defendant's refusal to cooperate, where some cooperation was indispensable to effective competition, was not based on legitimate business reasons and supported an "inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival.").

## B. *Attempted Monopolization*

To state a claim for attempted monopolization, a plaintiff must allege: 1) that the defendant engaged in exclusionary conduct; 2) with the specific intent to obtain monopoly power; and 3) a dangerous probability exists that the attempt will succeed. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *CVD, Inc.*, 769 F.2d at 851 ("[A] specific intent to

monopolize or restrain competition can often be inferred from a finding of bad faith."). As shown above, allegations concerning the first two elements are sufficient.

To satisfy the last element of this claim, plaintiff must allege facts to show that there was a dangerous probability that BSC would achieve a monopoly as a result of the alleged actions. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 693 (10th Cir. 1989). The probability of successfully monopolizing a market is usually assessed through market share. *See id.* at 694. The greater share a defendant initially controls, the greater the probability of achieving monopoly status. *See id.* ("[A] 41% market share typically indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels."). However, "proximity to monopoly status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market." *Id.* at 694.

HP alleges that after acquiring CVIS, BSC purposely leveraged its IVUS catheter monopoly and engaged in anticompetitive conduct to monopolize or attempt to monopolize the IVUS console business as well. BSC's alleged 90 percent market share of catheters and 40 percent market share of consoles, together with the other allegations, are sufficient to demonstrate a dangerous probability that an attempted monopolization would succeed in either the catheter or console markets.

## C. *Antitrust Injury*

Antitrust plaintiffs face an additional requirement to allege an "antitrust injury." *See SAS of Puerto Rico v. Puerto Rico Tel. Co.*, 48 F.3d 39, 43–44 (1st Cir. 1995); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 752 (1st Cir.1994). Failure to make such a pleading is a fatal defect. *See SAS*

*Puerto Rico,* 48 F.3d at 46 (affirming the dismissal of a complaint that failed to allege an antitrust injury). The Supreme Court defined this term as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' conduct unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

■■■ Antitrust laws were designed to protect the "competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 486 (1st Cir.1988). Based on this objective, the "presumptive[ ] 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market." *SAS Puerto Rico,* 48 F.3d at 44. When a defendant engages in anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market has standing. *See Wojcieszek v. New England Tel. & Tel. Co.,* 977 F.Supp. 527, 535 (D.Mass.1997).

■■■ HP claims that BSC injured the competitive process by engaging in predatory acts which drove HP out of the market for both consoles and catheters, depriving consumers of a meaningful choice of competing innovative products. If proven, these allegations are sufficient to show that BSC injured competition, which is exactly the type of injury the antitrust laws were designed to prevent.

### D. *State Claims*

The motion to dismiss the state claims is *DENIED.*

### IV. ORDER

For the reasons discussed herein, the Court *DENIES* motion to dismiss (Docket No. 10).