**PRECISION PRINTING COMPANY, INC., Plaintiff,**

v.

**UNISOURCE WORLDWIDE, INC., a Delaware Corporation, Defendant.**

**Civil Action No. 96–151.**

United States District Court, W.D. Pennsylvania.

Jan. 30, 1998.

---

Charles A. Merchant, Goehring, Rutter & Boehm, Pittsburgh, PA, for Plaintiff.

Dale Hershey, Mary K. Austin, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

Precision Printing Company, a now defunct business forms producer, has sued Unisource Worldwide for alleged acts of fraud, breaches of contract, and, most significantly, antitrust violations of the price-discrimination provisions of the Robinson–Patman Act, 15 U.S.C. § 13(a). Precision contends that Unisource, a major supplier of bulk paper, illegally gave Precision's competitors more favorable prices, increasing Precision's relative raw material costs and thereby making it uncompetitive in the forms marketplace. Precision also alleges that Unisource fraudulently misrepresented that it would give Precision its most favorable prices but failed to do so. Unisource denies all of these allegations and has counterclaimed for money Precision allegedly owes on various unpaid invoices. The parties have filed cross-motions for summary judgment and the case is now ripe for disposition. For the following reasons, I will deny plaintiff's motion and grant summary judgment to defendant.

## I. FACTUAL BACKGROUND

Precision Printing Company was in the business of manufacturing and selling printed forms to businesses, banking institutions, health care facilities and other organizations.[1] It operated in the short-to-medium run segment of the market, generally producing 500 to 10,000 forms on any given order. Dkt. no. 25, at 105, 144. Precision's most significant raw material was blank paper, which averaged 55 to 75 percent of the cost of production, and 35 to 45 percent of the net sale price to the customer. *Id.* at 314, 331. Precision purchased paper from a variety of suppliers, but primarily from Unisource and its predecessor, Copco.[2] Dkt. no. 20, exh. 6, at 64–65, 68; dkt. no. 25, at 107.

Precision's two principal competitors were Business Forms, Inc. ("BFI") and Thornhill Printing, both of which were short or medium-run printers of comparable size. Dkt. no. 25, at 136–137, 144, 324, 328. All three manufacturers produced their product using essentially the same type of machinery, paper and techniques. *See id.* at 136, 143–44, 147–49, 152, 327.

Unisource is a Delaware corporation with its principal place of business in Columbus, Ohio. Its primary business is selling wholesale quantities of paper to commercial printing companies like Precision and its competitors, for which purpose it maintains a warehouse in Pittsburgh, Pennsylvania. Unisource sells on demand from this warehouse to fill the ad hoc needs of its customers; such transactions are referred to by the parties as warehouse sales. During the time period material to this litigation, Precision purchased all of its non-carbonless paper in this manner. Unisource also sells truckload quantities of paper, either directly from the manufacturer or from a Unisource warehouse outside Pennsylvania, in what are known as direct sales. These transactions typically involve lower prices than warehouse sales. Dkt. no. 20, Dunkle decl.

¶ 3–4, exh. 7, at 27–28. In addition, Unisource operated a "Just–in–Time" ("JIT") plan, under which purchasers could obtain better prices and stabilized paper availability by committing to purchase specified quantities of paper.

In 1994, Unisource added a division known as Rollsource. The function of Rollsource was to service specifically the needs of those members of the web offset printing industry, such as Precision and its competitors, who purchased paper primarily in roll form. Dkt no 25, at 145–46. Rollsource apparently operated in a manner similar to the JIT plan. Precision, however, unlike its competitors BFI and Thornhill, was not given an offer to become a Rollsource customer. *Id.* at 343. Unisource typically purchased paper from Rollsource to service non-Rollsource customers like Precision, then "internally burdened" the transaction with overhead costs before setting the final price. Dkt. no. 33, exh. E, at 113–14, 153. As a result, those customers who remained with Unisource generally paid higher prices for paper than Rollsource customers paid.

All of Unisource's sales were made pursuant to invoices with "boilerplate" terms and conditions on the reverse sides. Dkt. no 20, Dunkle decl., ¶ 2. Those terms included an integration clause and a contractual, one-year statute of limitations for any claims against the seller. The invoices made no representation regarding how the prices charged compared to the market in general or to any other customer in particular.

Precision Printing developed serious cash flow problems and began to fall behind in paying its paper suppliers sometime around 1992. As a result, some vendors placed Precision on COD status and would not sell product to it except for cash. Unisource, however, worked out payment terms that allowed Precision to continue buying paper while it paid down its past debt, although it

---

1. Although Precision still exists as a corporate entity, it ceased operations on December 31, 1996.

2. Much of the paper Precision purchased consisted of carbonless forms paper, dkt. no. 25, at 151, which came directly from Appleton Paper, was priced solely by Appleton, and only passed through Unisource, which acted merely as a sales agent on those transactions. Because Unisource played no part in the pricing of carbonless forms paper, I will not consider sales of that type of paper in my antitrust analysis.

refused to take Precision on as a Rollsource customer because of its credit history.[3] *See* dkt. no. 20, exh. 8 *passim;* dkt. no. 33, exh. C at 22; exh. E, at 154–55. According to Precision, Unisource also promised to supply its paper needs at a price at or below "market."

Precision alleges that, in early 1995, it became aware that Unisource, contrary to its promise, was charging Precision twenty percent more for paper than the prices charged its competitors, Thornhill and BFI. Dkt. no. 25, at 131. That discovery was the impetus for the filing of this suit.

## II. STANDARD FOR EVALUATING SUMMARY JUDGMENT MOTIONS

The standard for granting summary judgment is, twelve years after the *Celotex* trilogy of cases, well-established. Summary judgment shall be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he burden on the moving party may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). "[S]ince a complete failure of proof concerning an essential element," *id.,* 477 U.S. at 323–24, on which a party bears the burden of proof at trial establishes that the moving party is "entitled to a judgment as a matter of law," the nonmoving party must establish the existence of every element essential to [its] case. *Id.*

Once the moving party has satisfied its burden, the nonmoving party is required by Federal Rule of Civil Procedure 56(e) to establish that there remains a genuine issue

of material fact. *Clark v. Clabaugh,* 20 F.3d 1290, 1294 (3d Cir.1994). The nonmovant "may not rest upon mere allegation or denials of [its] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law ..." *id.,* 477 U.S. at 248, and is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 257.

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255. Whether an inference is justifiable, however, depends on the evidence adduced. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 595–96, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). Likewise, "simply show[ing] that there is some metaphysical doubt as to the material facts" does not establish a genuine issue for trial. *Matsushita,* 475 U.S. at 586.

## III. LIABILITY UNDER THE ROBINSON–PATMAN ACT

### A. *Introduction*

■ Precision contends that Unisource practiced price discrimination in violation of § 2(a) of the Robinson–Patman Act by granting Precision's principal competitors lower prices than it gave Precision.[4] This type of disparate pricing, in which a manufacturer or distributor favors certain of its customers at the expense of others, is known as secondary line discrimination, in contrast to primary

---

**3.** In May 1995, Precision stopped making its debt reduction payments and Unisource filed a collection suit in the Allegheny County Court of Common Pleas, which is docketed at GD 95–20037 and is still pending.

**4.** The Robinson–Patman Act is, in actuality, a 1936 legislative amendment of the 1914 provisions of the Clayton Act. *See* 49 Stat. 1526 (1936); 38 Stat. 730 (1914). Thus, the Clayton and Robinson–Patman acts will be referred to interchangeably, except where the difference is significant.

line discrimination, in which one seller charges discriminatory prices in order to gain an advantage over its own competitors. *See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 n. 1 (2d Cir.1987); ABA Section of Antitrust Law, *Antitrust Law Developments (hereinafter "ABA Treatise")* 446 (4th ed.1997); William C. Holmes, *Antitrust Law Handbook* § 3.03, at 494 (1997).

■ "Stated broadly, Section 2(a) of the Clayton Act provides that a seller cannot discriminate in price between purchasers of goods of like grade and quality where substantial competitive injury may result." Holmes, *supra*, § 3.02, at 483. Although the Act's purpose is simple to state, its interpretation and application are not; indeed, because of its imprecise drafting, numerous courts and commentators have noted that Robinson–Patman is one of the most difficult, if not inscrutable, antitrust laws in existence. As one commentator has written:

> [T]he Robinson–Patman Act of 1936[ ] is the most awkwardly drafted of all antitrust legislation. This statute was a roughly hewn, unfinished block of legislative phraseology when it left Congress, and has required much interpretive refinement by the [Federal Trade] Commission and the courts to reveal the contours of its meaning and application. Indeed, so confusing is some of this language that experience in applying its provisions is the only reliable guide for the wise practitioner.

Jerrold G. Van Cise *et al., Understanding the Antitrust Laws* 56 (9th ed.1986); *accord Automatic Canteen Co. v. Federal Trade Comm'n*, 346 U.S. 61, 65, 73 S.Ct. 1017, 1020, 97 L.Ed. 1454 (1953) (Frankfurter, J.) ("precision of expression is not an outstanding characteristic of the Robinson–Patman Act"); Robert H. Bork, *The Antitrust Paradox* 382

(2d ed.1993) (referring to the Act as "the misshapen progeny of intolerable draftsmanship coupled to wholly mistaken economic theory"); Holmes, *supra*, § 3.02, at 483 (the Robinson–Patman Act is "[t]he most complex and controversial of the antitrust laws"); ABA Treatise, *supra*, at 429 (the Act's "complex draftsmanship has led to extensive interpretation").[5]

Section 2(a) of the Robinson–Patman Act provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to

---

5. The Act has been assailed on policy grounds as well, the most frequent criticism being that its prohibitions on price discrimination protect inefficient competitors at the expense of consumer welfare, placing the Act in tension with the remainder of antitrust law. *See, e.g.,* Bork, *supra*, at 382–94. Indeed, the government, which has responsibility for enforcing the Act's provisions, has largely ignored it in recent times. *See* Holmes, *supra*, at 484 (noting that the United States Department of Justice "has been openly

critical of the Act for several years and has refrained from actively enforcing it"); ABA Treatise, *supra*, at 430 ("government enforcement generally has been limited to FTC cases, and FTC enforcement of the Act in the last fifteen years has been minimal"). For purposes of adjudicating this case, of course, such criticism carries no weight; this court's task—and its only task absent unconstitutionality—is faithfully to apply any statute that Congress has enacted.

particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

15 U.S.C. § 13(a). I will now proceed to analyze the facts presented by this record against the recognized elements of a case arising under the above-quoted statutory provision.

### B. The Commerce Requirement

■ Section 2(a) of the Act makes it "unlawful for any person *engaged in commerce, in the course of such commerce, . . .* to discriminate in price . . . where either or any of *the purchases involved in such discrimination are in commerce. . . .*" 15 U.S.C. § 13(a) (emphases added). Thus, the plaintiff must establish three elements to meet the commerce requirement: (1) the defendant must be engaged in interstate commerce; (2) the price discrimination must occur in the course of that commerce; and (3) at least one of the transactions that the plaintiff proffers for comparison to prove discriminatory pricing must have actually moved in commerce; that is, crossed a state

line. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 200, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).[6] As a practical matter, if the third element is satisfied, the first two will be as well. *See Liquilux Gas Servs. v. Tropical Gas Co.,* 303 F.Supp. 414, 416–17 n. 2 (D.P.R. 1969); *In re International Tel. & Tel. Corp.,* 104 F.T.C. 280, 419 (1984); ABA Treatise, *supra,* at 430 & n. 9.

■ In any event, Unisource does not dispute, nor could it, that it engages regularly in interstate commerce. The fact that it purchases and sells paper from out-of state manufacturers through warehouses in several states to customers dispersed among those states satisfies this requirement. Moreover, it is clear that Unisource's alleged price discrimination took place "in the course of such commerce." The discrimination Precision alleges occurred in the course of Unisource's regular business of selling paper, not in some isolated transaction unrelated to it, such as the sale of a used forklift from Unisource's warehouse.

That leaves the question, did the goods in at least one of the sales that Precision must compare to prove discriminatory pricing physically cross a state line? In the direct sense, the answer is "no." Precision, its principal competitors and the Unisource warehouse through which the shipments passed are all located within Pennsylvania. From this, Unisource argues that its sales fail the commerce test set forth in *Copp.* This is only partly correct.

In *Copp,* the plaintiff was a producer of asphaltic concrete used for surfacing highways and defendants were manufacturers of liquid petroleum asphalt, a key component of plaintiff's product. 419 U.S. at 188–89. Plaintiff alleged that defendants had sold asphalt at discriminatory prices, charging more for the product in places where plaintiff was not a competitor. *Id.* at 190–91. All of defendant's relevant sales were made inside the State of California, and, due to the extreme bulk and low value of asphaltic concrete,

---

**6.** This statutorily imposed "in commerce" nexus is a significantly higher burden than that present under the Commerce Clause in general, or the Sherman Act in particular. *Id.,* 419 U.S. at 194–

**95.** The commerce requirement under the Robinson–Patman Act, therefore, is properly viewed as both a substantive and jurisdictional prerequisite for the imposition of liability.

plaintiff could sell its product only inside its home state. *Id.* at 188–89. Plaintiff accordingly argued that the fact that the asphaltic concrete was used to surface local segments of the interstate highway system caused the sales to be "in commerce."

The Supreme Court disagreed, holding that, under the stringent commerce test set forth in the Act, one or more of the compared transactions must cross a state line. *Id.* at 200. In so holding, the Court stressed the need for the "facially narrow" language of the Act to be applied in a manner that is "anchored to the economic realities of interstate markets, the intensely practical concerns that underlie the purposes of the antitrust laws." *Id.* at 198. Thus, the Court opined that the Act reaches "only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Id.* at 195.

A similar result was reached in *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Pet. Corp.*, 79 F.3d 182 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996). There, plaintiff operated a refined petroleum distribution business in Puerto Rico, which sold, *inter alia,* bunkering oil used to fuel ships. Defendant operated an oil refinery on the same island. *Id.* at 186. Plaintiff alleged that defendant practiced price discrimination by selling fuel to plaintiff's competitors at lower prices, eventually forcing plaintiff out of business. The court held that § 2(a) of the Robinson–Patman Act could not be applied because none of the sales had crossed a state line. *See id.* at 189, 190.

■ This general rule is refined, however, by the "stream of commerce" doctrine. When a manufacturer ships its goods in interstate commerce to a wholesaler's warehouse for its general inventory, any otherwise intrastate sales the wholesaler then makes to its customers are not considered "in commerce." The stream of commerce is

deemed to have been broken. As one court put it:

> The flow of commerce ends when goods reach their "intended" destination. In gauging the point of destination courts consider whether goods coming from out of state respond to a particular customer's order or anticipated needs. If so, the sales meet the "in commerce" requirement even though the goods may be stored in a warehouse before actual sale to the buyer. However, goods leave the stream of commerce when they are stored in a warehouse or storage facility for general inventory purposes, that is, with no particular customer's needs in mind.

*Zoslaw v. MCA Dist. Corp.*, 693 F.2d 870, 878 (9th Cir.1982) (citations omitted).[7]

■ Accordingly, it is generally held that such warehouse sales lose their intrastate character, notwithstanding an intrastate sale, if any of the following three conditions are met: (1) the goods are purchased by the supplier upon the order of a customer with the definite intention that the goods are to go at once to the customer; (2) the goods are purchased by the supplier to meet the needs of specified customers pursuant to some understanding with the customer, even though the goods are not to be delivered to the customer immediately; (3) the goods are purchased by the supplier based upon anticipated needs of specific customers. *See, e.g., L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1116 (5th Cir.1982); *Luzerne & Lackawanna Supply Co. v. Peerless Indus., Inc.*, 855 F.Supp. 81, 85 (M.D.Pa.1994); *Callahan v. A.E.V., Inc.*, No. 92–556, 1994–2 Trade Cases (CCH) ¶ 70,761, 1994 WL 682756, *7 (W.D.Pa. Sep. 26, 1994) (citing cases); *cf. Standard Oil Co. v. FTC*, 340 U.S. 231, 237–38, 71 S.Ct. 240, 243–44, 95 L.Ed. 239 (1951) (gasoline stored at bulk facility in anticipation of customers' anticipated winter demands remained in interstate commerce).

■ Applying this standard, it is evident that none of Unisource's sales to Precision met the commerce requirement. Precision purchased from Unisource's Pittsburgh

---

7. The *Zoslaw* court acknowledged the Supreme Court's decision in *Copp* and held, along with two other circuits, that the stream of commerce doctrine retained its viability after that case. *Id.* at 878 n. 10 (citing cases).

warehouse on an ad hoc, spot-market basis as its needs dictated. None of the goods it purchased physically crossed a state line between their shipment by Unisource and their receipt by Precision. Except for the few truckload purchases Precision made, which it neither identifies in the record nor relies upon in its price comparisons, all of Unisource's sales to Precision retained their intrastate character.

■ Unisource's sales to Precision's competitors stand on a somewhat different footing. Those customers commonly purchased by the truckload or through the JIT program, whether from Unisource or Rollsource. Truckload sales were shipped from outside Pennsylvania and thus directly satisfy the commerce requirement. And in order to participate in the JIT program, purchasers had to commit to certain tonnage requirements in advance. Accordingly, all of Unisource's purchases from the various paper manufacturers to supply its JIT requirements were made to meet "the anticipated needs of specific customers," *Murphy*, 674 F.2d at 1116. As to these sales, the stream of commerce was not broken and the commerce requirement was accordingly met. To recapitulate, all of the competitors' truckload and JIT sales remained in commerce.[8]

### C. Price Discrimination
#### 1. Legal Standard

■ For any claim asserted under § 2(a) of the Robinson–Patman Act to succeed, the plaintiff must adduce evidence of an actual instance of price discrimination. This requirement is straightforward: under the Act, "price discrimination means nothing more than a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade or quality." *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir.1995) (citing cases); *accord Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) ("price discrimi-

nation within the meaning of § 2(a) is merely a price difference"). The different prices, however, must have been charged at reasonably contemporaneous times. *See Zwicker v. J.I. Case Co.*, 596 F.2d 305, 309 (8th Cir. 1979); *Atalanta Trading Corp. v. FTC*, 258 F.2d 365, 371–72 (2d Cir.1958) (§ 2(d) case).

#### 2. Facially Disparate Prices

There is no question that Unisource made sales to two or more different purchasers, or that the products sold were of like grade and quality. Precision, Thornhill and BFI all purchased standard grades of roll paper from Unisource. Nor can it be seriously contended that the sales were not reasonably contemporaneous; indeed, the record indicates that at least one pair of sales took place on the same day. Dkt. no. 25, at 243–44.

■ The record also indicates that the same product was sold at facially different prices. On February 8, 1994, for example, Precision purchased 12 pound white forms bond and 15 pound white forms bond paper from Unisource (Copco), priced at $57.00 and $50.50 per hundredweight, respectively. That same day, BFI purchased the same two types of paper from Rollsource at $46.00 and $38.00, respectively. *Id.*

Precision also relies on certain invoices, *see* dkt. no. 25, at 220–23, which most likely document an April 1992 warehouse sale because less than a full truckload of paper was shipped, although it could have been a JIT less-than-truckload sale. If it was only a warehouse sale, then it retained its intrastate character and was not actionable. It is not clear from this record, at least as argued by the parties, whether this, or any, Unisource invoice constituted a discriminatory, "in commerce" sale to a Precision Printing competitor. If such a sale took place, then a facial instance of price discrimination exists there as well. In either event, however, Precision has adduced sufficient evidence of at least one price difference on an "in commerce" (Rollsource) transaction.[9]

---

**8.** Of course, if Precision's competitors made any "spot" purchases, that is, purchases not covered by a JIT or similar agreement, those sales would, like Precision's, have to be considered intrastate in character.

**9.** Although not relevant to the instant discussion, the precise number of discriminatory sales bears heavily on the issues of economic harm and damages.

### 3. Sales by Rollsource

■ For its part, Unisource argues that any sales made by Rollsource must be excluded as a matter of law from the price discrimination analysis. It contends that Rollsource is a separate, independently managed subsidiary and therefore its sales to Precision's competitors cannot be compared to Unisource's sales to Precision (dkt. no. 21, at 17). According to Unisource, unless the parent (Unisource) actively controls the operations of the subsidiary (Rollsource), the subsidiary's separate form must be respected.

I cannot accept Unisource's argument. Rollsource is a *division*, not a *subsidiary*, of Unisource, as evidenced by Rollsource's price lists (dkt. no. 33, at UW01023), invoices (*id.* at UW00561) and Unisource's own admissions in its reply brief (dkt. no. 38, at 8). Thus, there is no separate corporate form to "respect."

Even if Rollsource were a subsidiary, it is questionable whether the Third Circuit would follow the principal case that Unisource relies upon, *Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.1986). The *Acme* court held that, "[i]n the absence of evidence that [the parent] actively controlled [the subsidiary] or the terms of the latter's sales, we must conclude that they are not the same seller." The court, however, failed to discuss a key Supreme Court case decided two years earlier, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). There, in deciding that a subsidiary could not legally be said to conspire with its parent within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1, the Court opined:

> A parent and its wholly owned subsidiary have a complete unity of interest.... With or without formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. [T]he parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.... Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or

a wholly owned subsidiary.... The economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.

*Id.*, 467 U.S. at 771–72.

■ This language, although technically dictum in the Robinson–Patman context, was extended to that act in another § 2(a) case, *Caribe BMW, Inc. v. BMW*, 19 F.3d 745 (1st Cir.1994). There, the First Circuit faced the issue of whether "a firm's wholly owned subsidiary and the firm itself amount to a 'single seller' under the Robinson–Patman Act[.]" Then judge Breyer, in a thoroughly reasoned opinion, concluded that they were a single entity for purposes of price discrimination analysis, relying on *Copperweld* to distinguish earlier contrary authority, including *Acme. Id.* at 749. The *Caribe* court also opined that "there does not seem to be any special Robinson–Patman Act purpose that a case-specific 'control' inquiry would further. To the contrary, one would not want a seller to be able to defeat the statute's clear objectives by transforming unlawful, into lawful, price discrimination through the creation of a separately incorporated 'distributor' that sells to the disfavored customers, whether or not the parent retained "control" over the pricing decisions of the subsidiary." *Id.* at 750.[10] In the face of this post*Acme* caselaw, I believe that the Court of Appeals, as well as the Supreme Court, would find *Caribe* persuasive. I therefore decline to accept Unisource's argument that even the subsidiary form should be respected in this instance.

### 4. The Functional Availability Defense

#### a. Introduction

Unisource contends that Precision's Robinson–Patman claim is negated by the "functional availability defense." According to Unisource, Precision had the option to take advantage of the same pricing programs offered to its competitors by participating in direct, JIT or truckload programs, but de-

---

**10.** *But see* Stephen Calkins, Copperweld *in the Courts: The Road to* Caribe, 63 Antitrust L.J. 345 (1995) (criticizing Caribe's extension of Copperweld to the Robinson–Patman Act).

clined to do so. Thus, Unisource argues, any higher prices that may have been paid by Precision were strictly its own fault and liability cannot attach to Unisource.

■ The functional availability defense is a judicial graft on § 2(a) and is not explicitly embodied in the text of the statute. ABA Treatise, *supra,* at 464; Holmes, *supra,* § 3.04, at 522. Although often referred to as a defense, it really is not a defense at all and is more properly thought of as the functional availability doctrine. As one court described it:

> Where a purchaser does not take advantage of a lower price or discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or that the discrimination is not the proximate cause of the injury.

*Shreve Equipment, Inc. v. Clay Equipment Corp.,* 650 F.2d 101, 105 (6th Cir.1981) (citing cases, including *Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3d Cir.1980)). In *Sweeney,* the Third Circuit held that "a uniform pricing formula applicable to all customers is not a price discrimination under the act[,]" as long as the favored "price was available, not only in theory but in fact, to all purchasers." 637 F.2d at 120. The *Sweeney* court thus held that the plaintiff failed to establish that the defendant's pricing discriminated in violation of the Robinson–Patman Act.

b. Plaintiff's knowledge of the existence of defendant's special pricing plans

■ A discount is not "functionally available" if the plaintiff did not know about it. *See Caribe,* 19 F.3d at 752. Here, however, the evidence indicates otherwise. Charles Bacu of Precision and Randy Dunkle of Unisource had discussed arrangements under which Precision would commit to specific quantities of paper in exchange for more favorable pricing, although Precision did not know at that time specifically what its competitors were paying or that they had taken advantage of it. Bacu admitted that Dunkle talked to him about truckload sales and the JIT program. Dkt. no. 20, Exh. 6, at 74, 76. And while Unisource never specifically offered him that program or gave him a price list, Precision was enrolled in a similar program at Brown Paper which did result in a lower price. *Id.* at 76. Thus, Bacu assumed that it would result in a lower price from Unisource as well. Nevertheless, Bacu told Dunkle that Precision could not avail itself of such a program with Unisource because he was having trouble keeping his commitment under Brown's plan and Precision was unable to commit to a set tonnage of paper per month. *Id.* at 78. The only reasonable inference from this evidence is that Precision knew that these discounts were available, but chose for its own reasons not to take advantage of them.

The same result obtains for truckload sales. Although Precision did occasionally buy a truckload on occasion in the past, its general policy was to buy paper as needed, not to fill up the warehouse. *Id.* at 60. That simply was not the fault of Unisource, but was a management decision by Precision.

That leaves only the Rollsource sales, as to which the record does indicate the existence of "in commerce" price differences. There, however, Rollsource declined to take Precision as a customer because of its past due credit history, just as it refused to take any customer with substantial past due balances. *See* dkt. no 33, exh. F at 24. "Section 2(a) is not violated when the credit decisions are based upon legitimate business reasons." *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1325 (6th Cir.1983) (holding no Robinson–Patman violation when manufacturer refused to extend favorable credit provisions to financially struggling dealer). Here, it was simply not an act of price discrimination to disfavor a buyer with a greater propensity for slow payment and doubtful accounts.

c. Were the favorable prices functionally available to all customers?

The availability doctrine is also limited by the requirement that the favorable prices must be functionally available to all customers. For example, if a manufacturer offers a bargain price on VCRs if the retailer purchases in lots of 100,000 units, that discount is functionally available only to the largest,

national chain retailers, not the local, independently owned appliance store. Hence, the discount does not satisfy the requirements of the availability defense. *See Federal Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 42–43, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (availability defense denied where no individual retail grocers ever purchased sufficient quantities of salt to obtain discount pricing). Here, however, by Precision's own admission in its brief "[d]uring the time period of 1990 through 1995, the three companies [Precision, Thornhill and BFI] were of comparable size. All three [were] short to medium run business forms printing companies." Dkt. no. 24, at 5. Thus, Precision was not denied more favorable pricing because of its comparatively smaller size vis-a-vis its competitors, but because of reasons peculiar to Precision Printing itself, specifically its bad credit and inability to commit to purchases in advance.

### d. Did a generally available special pricing program exist?

Precision nevertheless argues that the functional availability doctrine cannot be applied on summary judgment because the evidence is controverted as to whether these special pricing programs even existed or their terms were met by those companies receiving the favorable prices. It relies for this contention on the testimony of its competitors' personnel, through which it purports to show that the competitors were not aware that they received any special prices, and on the testimony of one of its own employees through which it seeks to establish that BFI and Thornhill were ineligible for JIT pricing.

On Precision's first point, Mr. Drechsler of Thornhill Printing testified that he had no idea what the JIT discount was or meant. Dkt. no. 33, exh. D at 54–55. He also testified that he participated in no special pricing programs with Unisource. *Id.* at 38. Drechsler also testified that, although he provided lists of paper quantities that Thornhill was committing to purchase in the future, no

one at Unisource asked him to do so. *See* dkt. no. 37, exh. 15, at 38. Nevertheless, while this witness may have suffered a lapse of memory or been ignorant of the pricing program's terms, the price lists on which he was examined during that phase of his testimony clearly referred to "JIT Warehouse Pricing." Dkt. no. 33, exh. J. UW9320–27. No contention is made that the documents were forged or fraudulent. Accordingly, Precision's reliance on Drechsler's ignorance of the program is unavailing.

Moreover, Thornhill normally purchased paper by the truckload, which Precision did not. *Id.* at 65–66. That in itself, would justify charging Thornhill a lower price, whether the truckloads were part of a JIT plan or not. If those truckloads came out of Unisource's general inventory, then they were not "in commerce," as already discussed. On the other hand, if they were not warehouse sales, they must have been part of a JIT or similar plan. So, either the lower price was not actionable, or it proves the existence of the very plan Precision denies.[11]

The best argument Precision has against applying the functional availability doctrine is that David Howell, a current Rollsource and former Unisource executive, did not name Thornhill and BFI as JIT customers, as evidenced in the following exchange:

Q. So to your knowledge neither BFI nor Thornhill were participating in a JIT prior to Rollsource?

A. In either of those account situations, I don't think there was ever a firm commitment made to be a preferred source or a single source....

Dkt. no. 33, exh. F at 29. Arguably, one could infer from this testimony that Thornhill and BFI were receiving the benefits of JIT pricing without meeting the same terms offered to others, including Precision. That would negate the functional availability doctrine and amount to price discrimination.

Nevertheless, such an inference is negated by the undisputed facts that Precision knew that discount programs were available, and

---

11. Even if the truckload were shipped out of the general inventory of a Unisource warehouse in another state, the fact remains that Precision had the opportunity to buy by the truckload—and had done so in the past—but declined to avail itself of that purchasing option during the time period relevant to this litigation.

that its competitors were committing to purchase certain tonnages of paper in advance, *see* dkt. no. 37, exh. 16, at 78. That commitment is what defendant asserts as the *sine qua non* of the JIT program in its brief and that is precisely what BFI and Thornhill, but not Precision, were able to make and keep. Had Precision not been financially troubled, and had management not made a policy decision to buy paper only on an "as-needed" basis, Precision would have had the benefit of the favorable prices enjoyed by its competitors. There would then have been no disparate pricing, regardless of whether those competitors were "really" eligible for the lower prices, and thus, no violation of the Robinson–Patman Act.

### e. Conclusion

Accordingly, I conclude that there is no genuine issue of material fact and that Unisource has satisfied the requirements to assert the functional availability doctrine. There was therefore no price discrimination, and no violation of the Act. For the sake of completeness, however, I will proceed to analyze the other elements of Precision's Robinson–Patman claim.

### D. Competitive Injury

Section 2(a) of the Robinson–Patman Act makes disparate pricing illegal only "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]"

15 U.S.C. § 13(a). In addition, § 4 of the Clayton Act provides a private right of action for treble damages only to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. I will analyze these two standards *seriatim*.

#### 1. Section 2(a) of the Robinson–Patman Act

The statute provides two ways for a plaintiff to demonstrate competitive harm. First, it can attempt to prove that the price discrimination was of such a character that may substantially "lessen competition or tend to create a monopoly[.]" 15 U.S.C. § 13(a). Second, the plaintiff can adduce evidence showing that the defendant's disparate pricing regime may substantially "injure, destroy or prevent competition with any person who either grants or knowingly receives its benefits, or the customers of either of them[.]"[12] *Id.* Unlike other federal antitrust statutes, which focus on harm to competition generally, *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Robinson–Patman Act is directed toward protecting individual *competitors* as well, *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531, 1535 (3d Cir.1990). Accordingly, the Act sets forth what is referred to as an "incipiency standard," meaning that a reasonable possibility of competitive harm, as opposed to demonstrated, actual harm, is sufficient to prove competitive injury. *See Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434–35, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983).

**12.** An interesting issue that arises under this language is whether, in a secondary line price discrimination case, the favored competitor must have actual knowledge of the discrimination. The statute, as set forth in the main text, proscribes price discrimination where its effect may be to "prevent competition with any person who either grants or *knowingly* receives the benefit of such discrimination, or with customers of either of them[.]" 15 U.S.C. § 13(a) (emphasis added). Preventing competition with the grantor (Unisource) is not an issue here, because this is not a primary line case, and there is no cited evidence in the record that Thornhill or BFI knew they were receiving better prices than Precision was being charged. In order to find competitive injury, then, I must rely upon the language referring to "with customers of either of them," specifically Precision's competition with Thornhill and BFI as the common customers of Unisource. Such a construction of the statutory text is plausible, but it tends to render "knowingly receives" as surplusage, in derogation of long-recognized canons of construction, under which courts should give meaning and effect to every word and phrase in a statute. Applying that canon, it would appear that the "customers of" language was included only to make "tertiary line" cases actionable and not to eliminate the knowledge requirement in secondary line cases. Because neither party raises this issue, and I have found no authority resolving it, I will proceed on the assumption that knowledge on the part of the favored purchaser is not required.

After many decades of judicial interpretation of the two-part statutory test quoted above, it has become well-settled that competitive injury, as a practical matter, "is usually shown in either of two ways: proof of lost sales or profits, or ... proof of a substantial price discrimination between competitors over time." *Feeser*, 909 F.2d at 1535 (citations omitted). I will address these two alternate standards in turn.

### a. Direct evidence of lost sales or profits

In *Feeser*, the evidence of lost sales the court found most persuasive was the testimony of the plaintiff's customers to the effect that plaintiff "lost sales because of its inability to match its competitors' prices...." 909 F.2d at 1537. Here, as in that case, there is testimony, in the form of a customer's affidavit, that at least one customer shifted business away from Precision because it was no longer price-competitive. Dkt. no. 25, at 1–2. In response, Unisource points to other evidence that other customers abandoned Precision because it made direct sales in competition with them or because they thought Precision was financially unstable. Precision's evidence is sufficient, nevertheless, for it to raise a genuine issue of material fact on the issue of competitive harm.

### b. Evidence of substantial price discrimination over time

This test, which has its roots in *Morton Salt*, presumes adverse competitive effects where "the price differential is (1) substantial enough to influence a disfavored customer's resale prices; or (2) occurs in a market with low profit margins and intensive competitive conditions." *Feeser*, 909 F.2d at 1538 (citing *Morton Salt*, 334 U.S. at 47, 68 S.Ct. at 828–29). "Generally, the longer the duration [of the price discrimination], the more likely injury will be found." In *Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1272–73 (3d Cir.1995), the court held that evidence of price discrimination in the range of 5–25% over three to four years was sufficient to meet this standard.

Here, Precision relies on the affidavit of its expert, Holly Sphar, CPA, who prepared an analysis of the prices charged to Precision and its competitors over the 37–month period from January 1992 through January 1995 and concluded that Precision paid eleven percent more for paper than did its rivals. This report is problematic, however, because it appears to include intrastate warehouse sales in its comparisons. As discussed *supra*, these transactions are not eligible for comparison because, even if they involve discriminatory prices, intrastate price discrimination is not forbidden by the Robinson–Patman Act. There is no indication in the Sphar report of which, if any, of the alleged discriminatory prices involved "in commerce" transactions, either as Rollsource sales, JIT sales or truckload shipments from Unisource. Rollsource, it must be noted, came into existence only in 1994. Accordingly, plaintiff has not adduced sufficient evidence of substantial price discrimination over time.

### 2. Section 4 of the Clayton Act

As already stated, there are two parts to the injury requirement in a Robinson–Patman case in which money damages are sought. While the mere likelihood of injury to competition or a competitor will suffice if the plaintiff seeks only an injunction, its entitlement to damages arises under § 4 of the Clayton Act, 15 U.S.C. § 15. *Feeser*, 909 F.2d at 1539. That section provides a private right of action for treble damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." Thus, in order to have standing to bring suit for damages, the plaintiff must show "fact of damage." *E.g., Allen–Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 201 (3d Cir.1994). "The amount of the damage is not important for antitrust standing; it is sufficient that some damage has occurred. There must, however, be some causal link between the damage and the violation of the antitrust laws." *Id.*

Although "antitrust plaintiffs have not been held to an unduly rigorous standard of proving antitrust injury," *Stelwagon*, 63 F.3d at 1273, and need only show a reasonable inference to avoid summary judgment

under *Feeser*, 909 F.2d at 1539–40, if the "direct evidence of injury" is insufficient to show that the defendant's antitrust violations, as opposed to other causes, contributed to some extent to plaintiff's injuries, plaintiff may not recover in damages. *Stelwagon*, 63 F.3d at 1274–1276.

In this case, Precision has produced evidence from which a factfinder could conclude that the plaintiff suffered actual injury, specifically the evidence of lost sales because Precision became uncompetitive in its pricing. Under *Feeser*, that is sufficient. 909 F.2d at 1540. While defendant has produced evidence that other factors caused Precision to fail, Precision has sufficiently presented a disputed issue of material fact on this point.

### E. Summary

Although Precision has raised disputed issues of material fact as to many of the elements of its Robinson–Patman claim, that claim fails in its entirety under the functional availability doctrine. Precision had the opportunity to obtain the lower prices it complains its competitors received, but, for its own reasons, chose or found itself unable to do so. Unisource is entitled to summary judgment on this claim, which will be dismissed with prejudice.

### IV. PRECISION'S STATE LAW CLAIMS

In addition to its Robinson–Patman antitrust claim, Precision has also alleged that Unisource made and breached oral promises that it would provide Precision with paper at or below the market price. In the alternative, Precision contends that Unisource never intended to fulfill its promise and is guilty of fraud.

### A. Breach of Contract

Precision avers that Unisource made an oral agreement under which it promised to sell paper to Precision at or below "market" price, an agreement Unisource breached

when it gave Precision's competitors better pricing. This claim is problematic, for two reasons.

First, all of Unisource's sales to Precision were made pursuant to standard, printed invoices. Dkt. no. 20, Dunkle decl. ¶ 2. These invoices contain *inter alia*, an integration clause:

14. **MISCELLANEOUS.** This contract constitutes the entire agreement between Buyer and Seller relating to the goods or services covered hereunder. No modifications shall be binding upon the Seller unless in a writing signed by Seller's duly authorized representative....

Dkt. no. 20, exh. 3. Precision attempts to avoid the effect of this clause, and the parol evidence rule it triggers,[13] by invoking section 2–207 of the Uniform Commercial Code, which provides:

Additional terms in acceptance or confirmation

(a) General rule.—A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) Effect on contract.—The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(c) Conduct establishing contract.—Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the

---

**13.** *See* 13 Pa.C.S.A. § 2202. Precision does not attempt to argue that the integration clause, if a part of the parties' contract *vel non*, was not "intended ... as a complete and exclusive state-

ment of the terms of the agreement." *Id.* Thus, to the extent the parol evidence rule applies, as discussed *infra*, both consistent and contradictory oral evidence must be excluded. *See id.*

writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

13 Pa.C.S.A. § 2207

Section 2–207 provides rules to deal with the "battle-of-the-forms" that often results when the buyer's purchase order and the seller's invoice contain conflicting terms. Those provisions have no application to this case, because there apparently were no dueling forms. Precision points neither to purchase orders nor to any other documents that purport to contravene any of the terms printed on Unisource's invoices.

 Even if there were such evidence, under § 2–207(b), Unisource's terms would be "construed as proposals for addition to the contract." *Id.* Because both parties are merchants, as defined in § 2–104,[14] Unisource's terms would be presumed to become part of the contract, unless they constituted material alterations or Precision lodged a timely objection to their inclusion. The record in this case is devoid of any evidence that Precision ever objected to the integration clause at any time during its course of dealing with Unisource, and Precision does not contend that the clause worked a material alteration of the bargain. Thus, the parol evidence rule is applicable and bars Precision from proving the terms of its alleged oral agreement. *See, e.g., Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments,* 750 F.Supp. 711, 714 (W.D.Pa. 1990) (Smith, J.) (citing cases), *aff'd,* 951 F.2d 1399, 1404–08 (3d Cir.1991); *Gianni v. R. Russel & Co.,* 281 Pa. 320, 126 A. 791 (1924).

Second, even if Precision were free from the restraints of the parol evidence rule and could attempt to prove an oral contract, Precision has failed to define the terms of that contract with any real specificity, as required by Pennsylvania law. *See, e.g., Seiss v. McClintic–Marshall Corp.,* 324 Pa. 201, 188 A. 109, 110 (1936). Indeed, Precision cannot even define the meaning of the term "market price;" its principal witness, Charles Bacu, testified that he didn't "know if there is a market price of paper. I never heard of a market price of paper, ever.... " Dkt. no. 20, exh. 6, at 92. Precision's best—and only—direct evidence of any kind of oral contract arises from the following snippet of testimony from Paul Blatnicky:

Q. Did anybody from Unisource tell you that the prices at which Unisource *was selling* to Precision Printing were at or below the market price?

A. I would say probably Randy Dunkle, yes.

Q. To the best of your recollection, what were the words he used?

A. "Paul, you *got* the best prices. Paul, we are going to keep you competitive. Paul we are not going to raise your prices this time even though we are raising everybody else's prices because we want you to be more competitive and give us more money.

Dkt. no. 33, exh. C at 68 (emphases added). This is insufficient.

 Dunkle's representation is not a promise that Unisource will, for a set period of time, sell Precision all of its paper needs at or below market price, but merely a statement of what Unisource's practice was at the time the statement was made, coupled with vague assurances about the future that do not lend themselves to effective judicial enforcement. Because Dunkle made no enforceable promise, Unisource cannot be held liable for allegedly breaching it.[15]

---

**14.** That section provides that a merchant is someone who "deals in goods of the kind[,] or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction...." 13 Pa.C.S.A. § 2104. Comment 2 states that, under § 2–207, "almost every person in business would ... be deemed to be a merchant...." Here, both parties regularly deal in bulk paper,

and must therefore be considered merchants within the meaning of this section.

**15.** Precision also attempts to use these statements to prove a course of dealing, as permitted by 13 Pa.C.S.A. § 2202(1). Under 13 Pa.C.S.A. § 1205, "[a] course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding

Accordingly, Precision's breach of contract claim fails and will be dismissed with prejudice.

### B. Fraud

Precision has also sued Unisource for fraud, alleging:

> 16. During the meetings between Plaintiff's representatives and Defendant's representatives, defendant promised that the price charged to Plaintiff for any purchases of wholesale paper products during the years 1993, 1994 and 1995 would be at or below the relevant market price for the particular wholesale paper products.

Dkt. no. 10, ¶ 16. Precision had earlier attempted to raise this issue as a counterclaim in the collection action pending against it in the Allegheny County Court of Common Pleas, but that court denied leave to amend its answer because Precision alleged only "a promise to do something in the future that [was] not kept," dkt. no. 20, exh. 5, an allegation insufficient, without more, to make out a claim of fraud.[16] I agree.

■■■ The law of fraud is well-settled. As the late Judge (formerly Justice) Hutchinson put it:

> Under Pennsylvania law, fraudulent misrepresentation has five elements, each of which must be proved by clear and convincing evidence. The elements are:
>
> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result.

Pennsylvania law requires the trial judge to decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise and convincing to make out a prima facie case.

*Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments,* 951 F.2d 1399, 1409 (3d Cir.1991); *accord Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 563 A.2d 1182, 1187 (1989). A mere promise to perform future acts, which promise is not kept, does not amount to fraud, *Mellon Bank,* 951 F.2d at 1409; *Krause,* 563 A.2d at 1187, although a promise which the promisor had no intention of keeping at the time he made it may be actionable as fraud. *Mellon Bank,* 951 F.2d at 1410 (citing cases); *Phoenix Technologies, Inc. v. TRW, Inc.,* 834 F.Supp. 148, 152 (E.D.Pa.1993).

■■■ Precision's fraud claim founders, first, on the fact that there is insufficient evidence that any such promise was ever made, as discussed *supra.* Thus, the first element of fraud—a misrepresentation—is not satisfied.

Second, as Unisource argues, there is no evidence that its "promise"—if in fact one was even made—was uttered with the present intent not to perform it. Precision responds that, at the time the statements were made, Unisource knew that it was not performing according to its terms by giving Precision prices at or below market. Accordingly, Precision asserts that a factfinder could infer that the promise was false when made.

I cannot accept this argument, and the following hypothetical illustrates my point. If a merchant says to a customer, "From now on, I will give you prices at or below mar-

---

for interpreting their expressions and other conduct." Put another way, the manner in which the parties performed in a previous similar sales transaction provides a basis for interpreting what their contract requires of them under their present contract. Here, however, no evidence is cited or argued to indicate that Unisource ever gave Precision the favorable prices to which it claims it was entitled. Without such evidence of past performance, Precision can only establish a "course of promises," not a course of dealing. This argument, then, is nothing more than an attempt to use parol evidence to prove what Unisource allegedly promised. Course of deal-

ing, which is admissible to explain or supplement even a fully integrated writing under UCC § 2–202, should not be permitted to be used as a "bootstrap" to avoid the stricter provisions of the parol evidence rule for complete and exclusive writings.

**16.** This state court holding would raise the question of preclusion if the judgment has become final. Because it is not clear from the record whether it has, I will proceed to decide the issue *de novo.*

ket," the fact that the merchant is not currently giving the customer the benefit of those prices has no bearing on its present intent to perform the promise. There could exist a whole host of reasons, totally unrelated to fraud, that would explain why the merchant would honestly promise to give superior pricing in the future, notwithstanding the inferior prices it was charging in the present. If the merchant had said, "you have always been given my most favorable prices, and you will continue to receive them in the future," then a claim of fraud becomes more persuasive. As Precision's argument stands, however, it cannot suffice. Precision's evidence simply does not permit the inference of a fraudulent state of mind.

Third, Precision has failed to sufficiently prove that it relied on Unisource's alleged misrepresentations, that is, that it made no special commitment to purchase paper from Unisource on account of its promise. I agree; the testimony of Precision officers and employees Bacu, Jurczak and Frueh indicates that Precision commonly price-shopped when purchasing paper. Dkt. no. 20, exh. 6, at 29–32, 70–72, exh. 8, at 57–58, exh. 10. Moreover, it is clear that Precision sometimes purchased paper from Unisource because other suppliers refused to extend credit to Precision. To the extent that occurred, those purchasing decisions were dictated by Precision's financial difficulties, not by its reliance on Unisource's promises. In the alternative, Precision would have taken the same actions even in the absence of the alleged misrepresentations.[17] Either way, the element of reliance is negated.

Finally, in its brief, Precision attempts to propound a theory at variance from the one alleged in its complaint and discussed *supra*:

Precision's claim ... is that Dunkle made a false representation when he promised Precision that it would receive the best available price while at the same time Unisource was charging Precision's competitors substantially less ...

Unisource's position [in this litigation] assumes that "market price" defines the industry price from all paper vendors. In this case, "market price" only defines what Unisource was charging its customers in the Pittsburgh area.

Dkt. no. 33, at 26–27. This theory also fails.

The term "market price" is defined as "the price that a commodity brings when sold in a given market; prevailing price." *Webster's New World Dictionary* 828 (3d coll. ed.1988). While market price could be interpreted to mean the price of paper generally in the Pittsburgh market, it cannot fairly be read to refer to the prices of a single seller in that market, at least in the absence of nearly perfect competitive conditions in which all suppliers charged the same price. Such market conditions were, as the record evidence of disparate prices and price-shopping behavior demonstrates, unknown in the Pittsburgh paper market. For Precision's theory to succeed, it would have to allege that Unisource promised it, not market price or better, but a price at or equal to the lowest price it charged any of Precision's competitors. Aside from the fact that this is not what Precision averred in paragraph 16 of its amended complaint, the record is devoid of sufficient evidence that any such representation was made, except for the testimony, quoted above, that, "Paul, you *got* the best prices." Even if that statement was made, it was not, as discussed supra, a promise to continue giving Precision the best prices.

I will therefore grant summary judgment to Unisource on this issue and dismiss the fraud claim with prejudice.

## V. UNISOURCE'S COUNTERCLAIM AGAINST PRECISION

Unisource has counterclaimed against Precision for $189,072.64 in unpaid invoices, and for a service charge in the amount of $73,738.33. In his deposition, Paul Blatnicky of Precision acknowledged that it had an outstanding account payable to Unisource of $163,700. Dkt. no. 20, exh. 11, at 2, 6–10, 30. Thus, it is undisputed that Precision owes Unisource at least $ 163,700, and Unisource

17. These weaknesses in Precision's fraud theory are further exacerbated by the difficulty, discussed *supra* in the disposition of the breach of contract claim, of finding that Unisource ever made any specific promise.

seeks partial summary judgment in this amount. Precision's only response is that it is entitled to a set-off based upon the results of its contract and fraud claims. Because all of Precision's claims are being dismissed on the merits, this argument is unavailing and partial summary judgment will be granted to Unisource in the amount of $163,700. Any monies over and above that amount, of course, remain to be resolved in future proceedings in this case.

### ORDER

AND NOW, this 30th day of January 1998, upon consideration of the parties' cross-motions for summary judgment (dkt.nos.20, 23) and the arguments relative thereto, it is hereby ORDERED and DIRECTED that:

1. Plaintiff's motion for summary judgment, dkt. no. 23, is DENIED.

2. Defendant's motion for summary judgment on plaintiff's claims and partial summary judgment on defendant's counterclaim, dkt. no. 20, is GRANTED.

3. Defendant's motion to compel deposition of Holly W. Sphar, dkt. no. 26 is DENIED AS MOOT.

4. Plaintiff's motion for protective order to quash subpoenas issued to third parties, dkt. no. 27, is DENIED AS MOOT.

5. Counsel shall appear in my Pittsburgh chambers on Friday, February 13, 1998, at 9:00 AM for a pretrial/status conference on the remaining issues presented by defendant's counterclaim.